1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:24-po-00188-SAB |
| Plaintiff, | ORDER RENDERING VERDICT |
| v. | |
| ROBERT M. BRATTON, | |
| Defendant. | |

16    On July 25, 2025, the Court conducted a bench trial in this petty offense proceeding.

17 Cody Chapple, AUSA, appeared on behalf of Plaintiff United States of America (the

18 "Government").  Laura Meyers, AFD, appeared on behalf of Defendant Robert M. Bratton

19 ("Defendant").  The Court took the matter under submission, and following review of the

20 evidence and arguments of the parties, the Court will render its verdict forthwith in compliance

21 with Federal Rule of Criminal Procedure 23(c).

**I.**

**BACKGROUND**

**A.      Testimony at Trial**

**a.  Testimony of Captain Rene Gabriel Villanueva**

26    Rene Gabriel Villanueva works for the Sierra National Forest and has done so in a law

27 enforcement capacity since 2015.  (ECF No. 32, p. 6:13-16.)  Villanueva's official title is

28 supervisory law enforcement officer, which is commonly called a "patrol captain."  (Id. at p.

6:20-21.)  Villanueva has been a patrol captain for at least five years, and his primary duties are supervision of four law enforcement officers in the Sierra National Forest, overseeing the Forest Protection Officer Program (consisting of 26 non-peace officer employees), and serving on a forest leadership team that helps administer the forest among the heads of the department.  (Id. at pp. 6:23-7:6.)  In addition, Villanueva reviews orders and policies that go to fire restrictions and campsite permitting, and he works with the department charged with this responsibility as well as the office of general counsel.  (Id. at p. 7:13-21.)  Villanueva explained that forest protection officers have authority to enforce federal regulations, such as federal misdemeanors in Title 36 of the Code of Federal Regulations ("C.F.R."), in the National Forest but with limitations.  (Id. at p. 7:8-9.)

Villanueva testified that in September 2024 there was a fire order in effect.  (Id. at p. 7:22-24.)  Villanueva explained that he had helped review that fire order and worked with the Fire Aviation Management Program within the Forest Service.  (Id. at pp. 7:25-8:1; p. 11:1-2.)  Indeed, Villanueva observed that there was a fire order effective from July 10, 2024, through November 15, 2024, and then a superseding fire order effective from August 30, 2024, through November 15, 2024.  (Id. at pp. 9:2-10:1.)  Villanueva explained that the superseding order was created likely because something was added to the original order and thereafter the date was updated.  (Id. at p. 10:2-7.)  Both the fire order and superseding fire order restricted fires in disperse areas.  (Id. at p. 10:8-9.)  This included campfires, stove fires, wood fires, charcoal fires—anything that has an open flame—in an area that is not designed for fires, such as a disperse campsite.  (Id. at p. 10:11-14.)[1]

Villanueva testified that the superseding fire order was in effect on September 7, 2024.  (Id. at p. 10:15-19.)  He also testified that the superseding order had been posted.  (Id. at p. 11:10-13.)  Villanueva explained that "[w]e're required to post [fire orders] at the district offices and the supervisor's office.  . . . We also . . . post on the social media page that's run by the forest, as well as the website."  (Id. at p. 11:15-18.)  In addition, Villanueva stated that the

---

[1] The fire restriction order and superseding order were both received into evidence without objection.  (ECF No. 32, p. 8:22-24.)

agency posts along corridors where the forest gets a lot of traffic as well as restriction signs along roadways and "anywhere else where we can get the message out to the public, on bulletin boards and things like that."  (Id. at p. 11:18-23.)  Villanueva stated that the supervisor's office is located at 1600 Tollhouse Road, Clovis, California, and the two district offices are located, "one off of Highway 168 in Prather, and the other is off of Road 225 in North Fork."  (Id. at p. 12:1-4.)

Villanueva continued, testifying that once a fire order is approved by the office of general counsel, the forest supervisor signs it and distributes it out to all employees via email.  (Id. at p. 12:15-19.)  Villanueva stated that this starts a chain reaction of procedures whereby front desk personnel are responsible to post the fire order in a usual location that contains all orders posted.  (Id. at p. 12:19-22.)  In turn, this prompts a public administration or administrative officer to post the order of forest website and on social media.  (Id. at p. 12:22-24.)  Thereafter, the district officer personnel would receive the order and then usually send out fire preventions teams to post signs along corridors.  (Id. at pp. 12:24-13:2.)  Fire prevention teams will also post the order wherever is feasible on bulletin boards in those areas.  (Id. at p. 13:2-4.)  Villanueva testified that the agency does "the same procedure each time.  When the order is signed, we go through the same process.  It's an understood process amongst the employees whose responsibilities are to put it out there."  (Id. at p. 13:12-15.)  Based on this understanding, Villanueva stated that this process happened with the superseding fire order.  (Id. at p. 13:5-7.)  However, Villanueva testified that he could not say if he had been to the district offices between August 30, 2024, and September 7, 2024.  (Id. at p. 13:18-23; p. 23:16-23.)

Villanueva discussed that notwithstanding a fire order, a person may still have a fire with permit in designated areas, such as public lands, Cal Fire lands, Bureau of Land Management lands, and Forest Service lands.  (Id. at p. 14:8-22.)  Though the permit allows for fires, it is still subject to restrictions, and it is the user's responsibility to check if there is a restriction.  (Id. at pp. 14:22-15:1.)  For example, even if there was a permit issued to user between August 30, 2024, and September 7, 2024, the permit would have been overruled by the superseding fire order.  (Id. at p. 15:2-8; see also id. at pp. 19:20-20:12.)

1    For the permitting process, Villanueva explained that there are two ways in which a user

2 can obtain a permit. (Id. at p. 17:5-19.) First, a user can go through a national forest website to

3 obtain a permit. (Id. at p. 17:5-8.) The user would be directed to a YouTube video that they

4 watch; the user then fills out their information, takes a quiz, and signs. (Id. at p. 17:7-13; p.

5 23:5-6.) The user then prints out the permit and can carry it on their person. (Id. at p. 17:13-14.)

6 Second, a user may obtain a permit by visiting a Forest Service office, a Cal Fire office, or

7 Bureau of Land Management office. (Id. at p. 17:15-17.) Under this method, a user goes to the

8 office front desk and asks for a permit; an employee then reviews the permit with the user and

9 then the user fills out their information and both the user and employee sign the permit. (Id. at p.

10 17:17-23.) At trial, Villanueva read from a sample California Campfire Permit, entered into

11 evidence, noting that the first bullet point stated: "Know and comply with all current fire

12 restrictions for the area where you plan to use a campfire." (Id. at p. 19:15-16.)

13                    **b.  Testimony of Officer Andrew Gabriel Sharpe**

14    Andrew Gabriel Sharpe is a forestry technician (prevention) at the Batterson Work Center

15 in the Sierra National Forest. (Id. at pp. 24:23-25:5.) Sharpe's duties include patrol in the Forest

16 Service, and he has done so for about four years; Sharpe has worked for the Sierra National

17 Forest for about 23 years. (Id. at p. 25:5-10.) In addition, Sharpe is a forest prevention officer

18 and has been so for about four years. (Id. at p. 25:11-13.) Sharpe's forest prevention officer

19 duties are, generally, assisting law enforcement as well as investigating and enforcing violations

20 of Title 36 of the C.F.R. (Id. at p. 25:16-17; pp. 25:24-26:1.) In addition, Sharpe's patrol duties

21 are to "educate, engineer, and enforce the law[,] to assist in fire prevention and then also assist

22 our law enforcement with other issues outside of fire." (Id. at p. 25:20-23.) Sharpe usually visits

23 the district ranger office once a week. (Id. at p. 45:19-25.) Though Sharpe could not be sure that

24 he visited the district office between August 30 and September 7, 2024, he confirmed that he had

25 visited in August 2024 and observed that fire orders "should be posted on an information board

26 out in front of the building." (Id. at p. 46:5-18.) Sharpe stated that did not recall seeing the

27 superseding order posted. (Id. at p. 47:7-11.)

28    On September 7, 2024, Sharpe began work at 8:00 a.m. (Id. at p. 26:4-10.) Sharpe

1    testified that he was aware that on that date there was a fire restriction was in effect. (<u>Id.</u> at p.

2    26:11-13.)  Specifically, Sharpe was aware of the superseding fire order effective from August

3    30, 2024, through November 15, 2024. (<u>Id.</u> at pp. 26:18-27:3.)  That morning, Sharpe received

4    information that there had been a campfire off Sky Ranch Road (also known as 406S10), which

5    is within the Sierra National Forest, and he headed to the location of the fire. (<u>Id.</u> at p. 27:4-20;

6    p. 28:2-4.)  Sharpe noted that there was a dispersed campsite there, which means there is an area

7    within the forest you can camp outside of designated campsites so long as you are not blocking a

8    road or a trail. (<u>Id.</u> at pp. 27:20-28:1.)  Sharpe was familiar with the specific area, and he had

9    visited it the day before noting that there had been two campers and no sign of a fire at that time.

10   (<u>Id.</u> at pp. 34:15-35:9.)

11        When Sharpe arrived at around 10:00 a.m., he drove up to the campsite, saw smoke,

12   pulled in, and saw the campfire. (<u>Id.</u> at p. 28:9-10; p. 50:19-22.)  Sharpe described the campfire

13   as "two feet by two feel, rock ring on it.  I could see visible wood, burning flame, [and] smoke

14   coming up." (<u>Id.</u> at p. 28:12-13; p. 51:9-11.)  Sharpe noted that there about 10 or so people in

15   the area. (<u>Id.</u> at p. 28:16; p. 51:1.)  Defendant then approached Sharpe. (<u>Id.</u> at pp. 28:20-29:23.)

16   Sharpe explained to Defendant that the forest had been under a fire restriction for about six

17   weeks and that the campfire would need to be put out. (<u>Id.</u> at p. 30:2-7.)  Defendant responded

18   that he had not been aware of the restriction. (<u>Id.</u> at p. 30:7-8.)  Sharpe then asked Defendant

19   how he had accessed the campsite, and Defendant stated he couldn't remember. (<u>Id.</u> at p. 30:8-

20   10.)  Sharpe asked if the nearby road, Sky Ranch Road, had been Defendant's route, and

21   Defendant agreed that he had taken Sky Ranch Road to the campsite. (<u>Id.</u> at p. 30:10-12.)

22   Sharpe then informed Defendant that "about a half mile or so, there's a fire restriction sign,

23   bright yellow, red word – lettering that says 'fire restriction.'" (<u>Id.</u> at p. 30:13-15.)  Defendant

24   stated that he "didn't see it." (<u>Id.</u> at p. 30:15.)  Defendant continued, saying that he and his group

25   had come up during the previous night; he could not remember what time but noted that it was

26   dark. (<u>Id.</u> at p. 30:16-18.)  Defendant then told Sharpe that he had a campfire permit but never

27   showed it to Sharpe. (<u>Id.</u> at p. 30:20-21; pp. 30:24-31:5; p. 33:5-7.)  Sharpe responded that the

28   permits require users to "know and comply with all regulations where you're going to have a

campfire."  (Id. at p. 30:21-23.)  Sharpe described that later in their conversation, Defendant stated that the campfire was already there when they arrived.  (Id. at p. 31:7-8.)  Sharpe responded, "so it was burning and you added wood to the fire?"  (Id. at p. 31:9.)  It was Sharpe's recollection that Defendant responded in the affirmative but noted that he had a permit and thought he could have a fire.  (Id. at p. 31:10-15.)

Sharpe then explained the rules and regulations to Defendant.  (Id. at p. 32:1-2.) Defendant responded that he had called the fire station, and someone told him that if he had a permit, he could have a campfire.  (Id. at p. 32:2-4.)  Sharpe asked which fire station, but Defendant could not remember.  (Id. at p. 32:4-5.)  After some discussion, Defendant believed he had called the Cal Fire Coarsegold station but was unable to give the name of who he had talked with.  (Id. at p. 32:5-13; 33:2-4.)  Sharpe informed Defendant that Cal Fire and the Sierra National Forest have mutual agreements, and Cal Fire knows when the forest goes into restrictions.  (Id. at p. 32:13-16.)  Sharpe then informed Defendant that regardless, Defendant was presently in the Seirra National Forest, on federal public land.  (Id. at p. 32:16-20.) Defendant responded that he did not know that.  (Id. at p. 32:18.)  Sharpe testified that even if Defendant had a permit, he would not have been allowed to have a fire at that location.  (Id. at p. 33:13-20.)  Following this interaction that lasted approximately 20 minutes, Sharpe issued Defendant a citation.  (Id. at p. 34:9-11; p. 52:11.)  Meanwhile, others in the Defendant's group extinguished the fire.  (Id. at p. 51:20-21.)

Sharpe then testified that he was familiar with the roads in the Central Valley that lead to the campsite and that the most direct way to get there would be to take Route 41 North and then turn off on Sky Ranch Road.  (Id. at p. 35:11-19.)  Sharpe continued, testifying that when the forest is running fire restrictions, it places fire restriction signs on the way to the campsite.  (Id. at p. 35:2-25.)  Sharpe stated that there would have been a fire restriction sign on the way to the campsite on September 7, 2024.  (Id. at p. 36:1-3).  Sharpe then described the yellow sign as it would have looked on September 7, 2024, which led to the campsite and was on the righthand side of the road.  (Id. at pp. 40:18-41:12.)  Sharpe noted that this type of sign goes up only when there is a fire order and taken down otherwise.  (Id. at p. 42:5-6.)  Sharpe observed that the sign

1    warned visitors that the forest was currently in fire restriction, and it was yellow for high

2    visibility.  (Id. at p. 42:1-2; p. 42:7-8.)  The sign was "maybe 100 feet" before a "blind curve."

3    (Id. at p. 50:17-18.)  Though the sign was not reflective, Sharpe considered it a high visibility

4    sign with the high contrast.  (Id. at p. 42:9-12.)  Sharpe observed that the sign is positioned so

5    that a vehicle's headlights would shine on it at night.  (Id. at p. 42:13-17.)  Sharpe estimated that

6    the sign was 10 feet away from the road and that during the daytime, a person would need to be

7    within 20 feet of the sign to be able to read it.  (Id. at p. 49:2-8.)  While the sign is angled toward

8    the road, Sharpe testified that a driver would need to look at it to read it.  (Id. at p. 49:13-14.)

9        Sharpe testified that he issued three citations in total on September 7, 2024, and he

10   explained that his typical practice was to write his probable cause statements once he is back at

11   his station at the end of the day.  (Id. at pp. 43:4-44:6.)  That day, Sharpe estimated that he was

12   likely back at his desk around 5:30 p.m. when he drafted his probable cause statement regarding

13   Defendant's citation.   (Id. at p. 44:9-14; pp. 53:13-54:1.)   Sharpe usually takes photos of

14   campsites with fire citations, but he did not take of a photo relating to Defendant's citation.  (Id.

15   at p. 45:6-9.)[2]

16                   **c.  Testimony of Defendant Robert Michael Bratton**

17       At some point in the fall of 2024, Defendant began planning for a camping trip with his

18   wife.  (Id. at p. 74:8-10.)  Neither Defendant nor his wife were avid campers, with Defendant

19   estimating his wife had camped approximately 20 years prior and longer for himself.  (Id. at p.

20   74:15-18.)  In preparation for his camping trip, Defendant testified that he called the Coarsegold

21   Fire Station 8, on or around August 30, 2024, regarding getting a fire permit or burn permit.  (Id.

22   at p. 74:21-22; p. 76:24.)  When Defendant called, the station informed Defendant how he could

23   obtain a fire permit.  (Id. at p. 75:1-3.)  Defendant was told he could obtain a permit online, and

24   that was the method he chose.  (Id. at p. 75:10-11; p. 76:8-13.)  Defendant testified that he asked

25

26   [2] When Sharpe filled out and signed his probable cause statement, he believed he had taken a photo of the instant
     campfire in this case.  (ECF No. 32, p. 54:2-5.)  However, Sharpe had been mistaken and contacted the Government
27   regarding this error.  (Id. at p. 54:6-56:10.)  Sharpe testified that while he had been mistaken on the issue of taking a
     photo, he did not believe he was otherwise confused when he filled out his probable cause statement based on the
28   conversation he had with Defendant.  (Id. at pp. 56:24-57:9.)  The Court finds Sharpe's testimony to be credible on
     this issue.

if "there were aware of any fire restrictions that that time, and they stated the[re] were not." (Id. at p. 76:13-15.) Before he got off the phone, Defendant testified that the man he was taking with told Defendant to "hold one second and then later said, 'Yeah, I just asked. There's no restriction for fire. As long as you have your permit, you should be fine.'" (Id. at p. 76:15-19.) Thereafter, Defendant accessed the website, watched a video, answered a question, and obtained a permit the very same day. (Id. at pp. 75:21-76:2; p. 77:1.) Defendant testified that the permit he received looked like the sample permit discussed by Villanueva. (Id. at p. 77:2-7.)

When Defendant left for his camping trip, he set out with his wife and children, and three other family members. (Id. at p. 77:12-14.) Defendant drove, and the family headed toward a campsite location known to the family of Defendant's wife. (Id. at p. 77:21-25.) They arrived at the campsite at around 10:00 or 11:00 p.m. (Id. at p. 78:2-3.) Defendant testified that he did not see any sign indicating a fire restriction was in place when driving up. (Id. at p. 78:4-6.) Defendant stated that after they arrived, he noticed that there was some coal still burning in a makeshift fire pit, but no other people were around. (Id. at p. 78:12-15.) At that point, Defendant added more rocks to the fire to make it safe and then put a log onto the fire to get rid of bugs and illuminate the area why his family set up camp. (Id. at p. 78:17-21.) After the family was done for the evening, Defendant extinguished the fire with the "stir, drown, feel" method. (Id. at p. 79:2-6.) Defendant testified that he got this method from the back of his fire permit, which he had reviewed. (Id. at p. 86:3-87:1.)

The next day, September 7, 2024, Defendant was the first person awake. (Id. at p. 79:11-12; p. 82:14-15.) He checked the firepit to ensure that it was structurally safe, and then he lit a small fire for warmth because it was unexpectedly chilly that morning. (Id. at p. 79:11-16.) Later that morning, Defendant testified that Sharpe pulled into the campsite driveway. (Id. at p. 80:4.) Defendant approached Sharpe and asked what he could do for Sharpe. (Id. at p. 80:6-7.) In response, Sharpe stated that Defendant had a fire, to which Defendant admitted. (Id. at p. 80:7.) Sharpe asked Defendant if he knew that there was a fire restriction in place, and Defendant stated that he did not but that he had a permit. (Id. at p. 80:8-10.) According to Defendant, Sharpe asked him if he could see the permit and Defendant complied, grabbing it

1  from his vehicle's dashboard.  (Id. at p. 80:8-12; p. 81:17-23.)  Though he had a permit, Sharpe

2  informed Defendant that he was still not permitted to have a fire at the campsite.  (Id. at p. 80:13-

3  14.)  Defendant asked Sharpe why he could not, and Sharpe explained that there was a restriction

4  in place.  (Id. at p. 80:15.)  Defendant stated that he did not understand because he had

5  previously called the station in Coarsegold, telling Sharpe it was the station off Road 417.  (Id. at

6  p. 80:16-18.)  Defendant stated that he called this station in particular because he used to live

7  close by 20 years prior.  (Id. at p. 80:18-21.)  Sharpe then asked Defendant if he had seen the fire

8  restriction sign when driving in, and Defendant stated that he had not.  (Id. at p. 80:22-24; p.

9  91:12-19.)  Defendant told Sharpe that he had arrived at around 10:00 or 11:00 p.m. the night

10  before and that there had been a fire burning already when they arrived.  (Id. at pp. 80:24-81:4.)

11  Sharpe asked Defendant is he had added a log or fuel to the fire, and Defendant stated that he had

12  added one log to the fire.  (Id. at p. 81:4-6.)  Sharpe explained that by adding a log, Defendant

13  had "started a fire."  (Id. at p. 81:6-8.)  Sharpe then told Defendant he would need to extinguish

14  the fire, and Defendant stated he would comply.  (Id. at p. 81:9-10.)  Sharpe then told Defendant

15  that he would be issuing a ticket.  (Id. at p. 81:10-11.)

16          On cross-examination, the following clarification and exchanged occurred:

17
18          THE GOVERNMENT:  So it's your testimony that when you spoke to Officer Sharpe and he asked you what did you do with the fire, you said, "I added a log to it, but you – and I'm referring to the day before, not the fire behind me."  Is that right?

19
20          DEFENDANT:  He had asked me when I got there the night before if there was already a fire there.  Once I told him I had gotten there the night before, he asked me if there was a fire there the night before upon my arrival.

21

22          THE GOVERNMENT:  But you added log to that fire?

23          DEFENDANT:  Correct.

24          THE GOVERNMENT:  And then you put it out?

25          DEFENDANT:  Correct.

26          THE GOVERNMENT:  And you put it out.  Then that morning because it was cold, you lit and started a new fire, right?

27
28          DEFENDANT:  Under the assumption that I had the permit and there was no fire restriction, that is correct.

1

2

THE GOVERNMENT:  But – so my question is you built a fire?

DEFENDANT:  My answer remains.

3

4

THE GOVERNMENT:  Sir, it's a yes or no question.  Yes or no, did you build a fire that morning on September 7, 2024?

5

DEFENDANT:  I refer to my previous answer.

6

7

THE COURT:  Mr. Bratton, if you would answer the question as asked. That's not how we do it.

DEFENDANT:  I'm not sure.

8

9

10

THE COURT:  The question is very simple, so just answer the question as he's asking you, not by saying, "My previous answer stands."  It doesn't work that way.  So please answer it. If you truly don't understand it, then just say you don't understand.

11

DEFENDANT:  Yeah, I'm not understanding.

12

13

THE COURT:  His question, I think, is pretty straightforward.  I don't know how else he would ask it.

But, Mr. Chapple, why don't you just re-ask it again.

14

15

THE GOVERNMENT:  The morning of September 7, 2024, you started a small fire, correct?

16

DEFENDANT:  Yes.

17

18

THE GOVERNMENT:  That fire was at a campsite within the Sierra National Forest?

19

DEFENDANT:  Are you asking if I knew that then or if I know that now?

20

THE GOVERNMENT:  Is that correct?

21

22

DEFENDANT:  I don't know, because I don't know if you're asking if I knew that then or if I know that now, because –

23

THE COURT: Why don't you clarify the question for him?

24

THE GOVERNMENT:  Did you know where you were camping when you camped there?

25

DEFENDANT:  No.

26

THE GOVERNMENT:  Had you ever camped there before?

27

DEFENDANT:  No.

28

(Id. at pp. 83:11-85:13.)

Defendant then stated that he could not remember the name of the person who he spoke with in the Coarsegold Fire Station 8, but he remembered that it was a man.  (Id. at p. 85:14-21.)  And while Defendant acknowledged that the sample fire restriction permit entered into evidence contained the bullet point: "Know and comply with all current fire restriction for the area where you plan to use a campfire," Defendant testified that he could not recall if it was on his permit.  (Id. at pp. 87:11-88:15.)  Defendant admitted that he did not check online to see if there were any fire restrictions in place anywhere in anticipation of his camping trip.  (Id. at pp. 89:19-90:1.)

The Court may decide which testimony to believe and which testimony not to believe. The Court may believe everything a witness says, or part of it, or none of it.  United States v. Rojas, 458 F.2d 1355, 1356 (9th Cir. 1972) (per curiam) ("It was for the trial judge, as finder of fact, to assess the weight and credibility of the witnesses' testimony.").  At this time, the Court addresses two aspects of Defendant's testimony.

First, though the Court finds that portion of Defendant's testimony credible that he called the Coarsegold fire station, the Court finds Defendant's testimony as to the *content* of what was discussed on that phone call to not be credible.  In particular, the Court observes that Defendant was unable to articulate who he spoke with at the fire station, which is compounded by the fact that the person who he spoke with on the phone apparently then spoke to someone else to retrieve information.  Without any indication of reliability, the Court finds Defendant's testimony as to the content of the phone call to not be reasonable, and thus not credible, in light of all the evidence.

Second, the Court finds Defendant's testimony that he did not see a fire restriction sign when driving to the disperse campsite off Sky Ranch Road to not be credible.  The Court bases this on Defendant's manner while testifying, Defendant's interest in the outcome of the case, as well as the reasonableness of this testimony in light of all the evidence.

### B.    Procedural Background

On September 7, 2024, Officer Sharpe issued a U.S.D.C. Violation Notice, charging Defendant with violating 36 C.F.R. § 261.52(a) by using a wood campfire during a fire restriction.  (ECF No. 1.)  This petty offense proceeding was commenced on November 27,

1  2024.  (Id.)  As relevant here, on July 25, 2025, the Court conducted a bench trial and admitted

2  Exhibits 1, 2, 4, 5, 7, and 9 into evidence.  (ECF No. 29.)  Following argument from Defendant

3  and the Government, the Court took the matter under submission and set a verdict hearing for

4  November 20, 2025.  (ECF Nos. 29, 33.)  Defendant moved for a Rule 23 findings of fact, which

5  the Court complies with in both open court and through this order.  Fed. R. Crim. P. 23(c).  On

6  November 20, 2025, the Court held a verdict hearing with Defendant present.

7                                                    **II.**

8                                        **LEGAL STANDARD**

9          Though certain specific constitutional protections are not applicable to petty offenses,

10  such as the right to a jury trial, "[t]hat is not true, however, of the proposition that guilt must be

11  proved beyond a reasonable doubt."  Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 632 n.5

12  (1988), citing Bloom v. Illinois, 391 U.S. 194, 205 (1968); see U.S. Const. amend. V.  "Due

13  process commands that no man shall lose his liberty unless the Government has borne the burden

14  of . . . convincing the factfinder of his guilt.  To this end, the reasonable-doubt standard is

15  indispensable . . . ."  In re Winship, 397 U.S. 358, 364 (1970).

16                                                   **III.**

17                               **DISCUSSION AND ANALYSIS**

18          Before making findings of fact, Defendant has made two arguments that would alter how

19  the Court would normally approach a violation of 36 C.F.R. § 261.52(a).  First, Defendant argues

20  that a fire restriction order must be proven as being "posted" beyond a reasonable doubt in order

21  to be enforceable.  (ECF No. 32, pp. 95:7-96:8; see id. at pp. 59:10-18; pp. 61:22-66:9; see also

22  ECF No. 26, p. 2.)  Second, Defendant argues that a *mens rea* of reckless or negligent should be

23  imported into the regulation, notwithstanding that the regulation is silent on a mental state.  (ECF

24  No. 32, pp. 96:9-97:13; see ECF No. 26, pp. 3-4.)  The Court begins with the elements of and

25  applicable law regarding the subject regulation before taking Defendant's arguments in turn.

26          **A.      Elements of the Offense and Applicable Law**

27          Defendant is charged with one count of violating 36 C.F.R. § 261.52(a).  A violation of

28  Section 261.52(a) is a Class B misdemeanor, punishable by not more than six (6) months

1    incarceration and/or a $5,000 fine.    Section 261.52(a) prohibits a person from building,

2    maintaining, attending, or using a fire, campfire, or stove fire when provided by an order.  36

3    C.F.R. § 261.52(a).  "The United States Forest Service has the authority to prohibit, by order, all

4    fires in a given area whenever circumstances warrant such action."  United States v. Launder,

5    743 F.2d 686, 691 (9th Cir. 1984).

6         To prove the defendant guilty under Section 261.52(a), the Government must prove,

7    beyond a reasonable doubt, that:

8        (1)    The defendant knowingly built, maintained, attended, or used a fire, campfire, or

9                stove fire;

10       (2)    An order prohibited the fire, campfire, or stove fire; and

11       (3)    The defendant's act occurred within the Sierra National Forest, within the

12               boundaries of federal owned lands and waters administered by the National Forest

13               System. See 36 C.F.R. § 261.1(a)(1); see also United States v. Lindsey, 595 F.2d

14               5, 6 n.1 (9th Cir. 1979) ("[Section] 261.1 authorizes promulgation of regulations

15               applicable to activities occurring in a national forest and to 'an act or omission

16               (that) affects, threatens or endangers property of the United States administrated

17               by the Forest Service."); United States v. Parker, 761 F.3d 986, 989 (9th Cir.

18               2014) (Section 261.1 applies to "activities that 'occur' in the national forest or

19               'affect' property administered by the Forest Service.").

20        Under Part 261, a Campfire "means a fire, not within any building, mobile home or living

21   accommodation mounted on a motor vehicle, which is used for cooking, personal warmth,

22   lighting, ceremonial, or esthetic purposes.  Fire includes campfire."  36 C.F.R. § 261.2.  A Stove

23   Fire "means a campfire built inside an enclosed stove or grill, a portable brazier, or a pressurized

24   liquid or gas stove, including a space-heating device."  Id.

25        **B.    Whether "Posting" Is an Element of 36 C.F.R. § 261.52(a)**

26        In order to understand Defendant's argument that the Government must prove, beyond a

27   reasonable doubt, that a fire restriction order was "posted" requires discussing a set of

28   interlocking regulations.  Defendant begins with Section 261.50, which authorizes certain Forest

1  Service officials to "issue orders . . . that close or restrict the use of described areas by applying

2  the prohibitions authorized in this subpart, individually or in combination."   36 C.F.R. §

3  261.50(a).  As relevant here, Forest Service officials may issue an order restricting specified uses

4  of fire.  36 C.F.R. § 261.52.  In Defendant's view, an order issued under Section 261.50(a) is

5  valid *only* if it satisfies the criteria in Section 261.50(c)(1)-(5).  Defendant contends that the

6  Government has not proven beyond a reasonable doubt that the relevant fire order was "posted"

7  within the meaning of Section 261.50(c)(5).  Therefore, Defendant argues that he should be

8  acquitted.  The Court is not convinced.

9      To begin, the Court quotes the relevant regulations.  Defendant is accused of violating 36

10  C.F.R. § 261.52(a), which states, in pertinent part:

11          When provided by an order, the following are prohibited:

12          (a) Building, maintaining, attending, or using a fire, campfire, or
            stove fire.

13  36 C.F.R. § 261.52(a).

14      Section 261.50 provides, in applicable part:

15

16          (a) The Chief, each Regional Forester, each Experiment Station
            Director, the head of each administrative unit, their deputies, or

17          persons acting in these positions may issue orders, consistent with
            their delegations of authority, that close or restrict the use of

18          described areas by applying the prohibitions authorized in this
            subpart, individually or in combination.

19                                  * * *

20          (c) Each order shall:

21                                  * * *

22              (5) Be posted in accordance with § 261.51.

23  36 C.F.R. § 261.50(a), (c)(5).

24      In turn, Section 261.51 provides:

25          Posting is accomplished by:

26          (a) Placing a copy of the order imposing each prohibition in the
            offices of the Forest Supervisor and District Ranger, or equivalent

27          officer who have jurisdiction over the lands affected by the order,
            and

28

14

1           (b) Displaying each prohibition imposed by an order in such locations and manner as to reasonably bring the prohibition to the attention of the public.

2

3   36 C.F.R. § 261.51.

4        When interpreting a statute, the court looks first to its text.  Ileto v. Glock, Inc., 565 F.3d

5   1126, 1133 (9th Cir.2009), citing Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).  "[W]hen

6   the statute's language is plain, the sole function of the courts—at least where the disposition

7   required by the text is not absurd—is to enforce it according to its terms."  Lamie v. U.S.

8   Trustee, 540 U.S. 526, 534 (2004).

9        Because Defendant is accused of violating Section 261.52(a), the Court begins its

10  analysis there.  Clearly, the regulation states that when provided by an order, building,

11  maintaining, attending, or using a fire, campfire, or stove fire is prohibited.  The regulation does

12  not otherwise discuss or define an "order."  The Court finds this regulation to be unambiguous

13  and that these to be the elements that must be proven beyond a reasonable doubt.  Should a fire

14  restriction order be provided, building a fire is prohibited.  This begs the question then of what

15  "provided by an order" means.

16        Section 261.50 states that the relevant authority "may issue orders . . . that close or

17  restrict the use of described areas by applying the prohibitions authorized in this subpart,

18  individually or in combination."  While the Section 261.50 does not explicitly define order, it

19  does provide, under subsection (c), that each order shall:

20             (1) For orders issued under paragraph (a) of this section, describe the area to which the order applies;

21

22             (2) For orders issued under paragraph (b) of this section, describe the road or trail to which the order applies;

23             (3) Specify the times during which the prohibitions apply if applied only during limited times;

24

25             (4) State each prohibition which is applied; and

26             (5) Be posted in accordance with § 261.51.

27        Though Section 261.50(c) includes a requirement that a restriction order shall be posted

28  in accordance with Section 261.51, it does not purport to otherwise negate an order providing for

a fire restriction. Defendant has not provided an argument or authority for why or how the Court would incorporate Section 261.51 posting requirement as an *element* requiring needing to be proven beyond a reasonable doubt within Section 261.52(a). The Court declines to do so. As stated, with regard to the phrase "[w]hen provided by an order," the Court finds that this merely requires that the Government prove that there was an order that prohibited the fire, campfire, or stove fire.

Defendant's authority is not persuasive. In <u>True</u>, the restriction order was "extraordinarily vague and flexible" in its content, which rendered the order unenforceable. <u>United States v. True</u>, 946 F.2d 682, 688 (9th Cir. 1991). Defendant does not contend that the fire restriction order here was vague or extraordinarily flexible in its content. Therefore, this case is not persuasive as to the incorporation of posting as an element of Section 261.52(a).

To be sure, Defendant has directed the Court to <u>United States v. Atwell</u>, a district court case arising out of the District of Oregon. 752 F.Supp.2d 1171 (D. Or. 2010). In <u>Atwell</u>, the defendant was charged with being on a closed road, in violation of a restriction order. <u>Id.</u> at 1171. With no analysis, the <u>Atwell</u> court assumed that the posting requirement in 36 C.F.R. § 261.51 was incorporated as an element into regulation prohibiting use of a closed road. <u>Id.</u> at 1174. The court acknowledged that "[c]ases addressing the sufficiency of posting under 36 C.F.R. § 261.51 are virtually non-existent, and none have been found within the Ninth Circuit." <u>Id.</u> The court then conducted a statutory analysis beginning with the posting definition. <u>Id.</u> The court found that the Government had failed to provide evidence that the order was posted in accordance with Section 261.51, and therefore, the court found the defendant not guilty. <u>Id.</u> at 1175. While an example of where a court determined that the posting requirement was incorporated into the regulation violation section, the court did not provide analysis as to why it required this.[3] Though the Court can understand the <u>Atwell</u> court's position, the Court respectfully finds it to be not persuasive on the issue of whether posting is an element of Section 261.52(a).

---

[3] The Court likewise finds Defendant's other authority to be analytically insufficient on this issue to be persuasive. <u>United States v. Robichaud</u>, No. 3:24-po-147, Dkt. No. 21 (E.D. Cal. April 8, 2025); <u>United States v. Davis</u>, No. 2:24-po-00343, Dkt. Nos. 17, 18 (E.D. Cal. April 11 and 14, 2025).

With the foregoing in mind, the Court finds that the Government has met its burden in proving that there was a fire restriction order in place on September 7, 2024.  Specifically, Captain Villanueva testified to the existence of the original and superseding fire restriction orders for the Sierra National Forest that both encompassed September 7, 2024.  (ECF No. 32, p. 8:22-10:19.)  Moreover, Villanueva explained that the fire order restricted fires, including campfires, in disperse areas.  (Id. at p. 10:8-14.)  Both orders were received into evidence and the Court finds Villanueva's testimony on this issue to be credible.  (Id. at p. 8:22-24.)[4]

That said, even assuming Section 261.52(a) requires the Government to prove that an order is "posted" beyond a reasonable doubt, the Court finds that the Government has done so here.  Villanueva testified that the superseding fire order had been posted.  (ECF No. 32, p. 11:10-13.)  Villanueva based this on his training and experience that the agency is "required to post [fire orders] at the district offices and the supervisor's office. . . . We also . . . post on the social media page that's run by the forest, as well as the website."  (Id. at p. 11:15-18.)  Once a fire order is signed, Villanueva explained that this created a chain reaction of procedures whereby front desk personnel are responsible to post the fire order in a usual location that contains all orders posted.  (Id. at p. 12:15-22.)  In turn, this prompts a public administration or administrative officer to post the order of forest website and on social media.  (Id. at p. 12:22-24.)  Thereafter, the district officer personnel would receive the order and then usually send out fire preventions teams to post signs along corridors.  (Id. at pp. 12:24-13:2.)  Fire prevention teams would also post the order wherever is feasible on bulletin boards in those areas.  (Id. at p. 13:2-4.)  Villanueva testified that the agency does "the same procedure each time.  When the order is signed, we go through the same process.  It's an understood process amongst the employees whose responsibilities are to put it out there."  (Id. at p. 13:12-15.)

---

[4] Though Defendant's argument raises the specter of violating due process with regard to notice, the Court notes that Defendant has not fully fleshed out this argument.  In any event, perhaps what distinguishes this case from Atwell and cases like it, is that a visitor wishing to visit the Sierra National Forest and burn a fire (outside a designated recreation site) is required to obtain a burn permit.  As testified to at trial, a burn permit requires that a visitor to watch a video, take a quiz, and sign (or visit an appropriate office and obtain information and a permit in person).  The permit requires that the visitor, "Know and comply with all current fire restrictions for the area where you plan to use a campfire."  (See ECF No. 32, p. 19:15-16.)  Thus, any notice concerns are dispelled by the visitor being required to know and comply with all current fire restrictions in an area.  This contrasts with Atwell, where the defendant was not required to obtain a permit to use a closed road.  752 F.Supp.2d at 1171.

1     That said, Captain Villanueva could not remember if he had personally been in the

2     district offices between August 30, 2024, and September 7, 2024.  (Id. at p. 13:18-23; p. 23:16-

3     23).  However, the Court finds Villanueva's testimony to be credible insofar as satisfying that it

4     was the pattern and practice of the district offices to post fire restriction orders as well as sending

5     out fire preventions teams to post signs along corridors and that is exactly what happened with

6     regard to the superseding fire order.  See 36 C.F.R. § 261.51.  Thus, the Court finds that the

7     Government has proven beyond a reasonable doubt that the subject fire order was posted, in

8     accordance with Section 261.51, on or before September 7, 2024.[5]

9         **C.    Whether Section 261.52(a) Contains a _Mens Rea_ Element**

10     While Section 261.52(a) is silent on a mental state, Defendant contends that the Court

11     should import a _mens rea_ of reckless or negligent into the regulation.  (ECF No. 32, pp. 96:9-

12     97:10; see ECF No. 26, pp. 3-4.)  The Government responds that this regulation is similar to

13     other regulations that the Ninth Circuit has found to not contain a _mens rea_ element.  (ECF No.

14     25, p. 3.)  Though the Court agrees with Defendant insofar as there is a _mens rea_ element to

15     Section 261.52(a), the Court concludes that the appropriate _mens rea_ is "knowingly" and applies

16     to whether Defendant knowingly built, maintained, attended, or used a fire, campfire, or stove

17     fire.

18     "[A]s a general matter, our criminal law seeks to punish the 'vicious will.'"  Ruan v.

19     United States, 597 U.S. 450, 457 (2022), quoting Morissette v. United States, 342 U.S. 246, 251

20     (1952).  With few exceptions, "'wrongdoing must be conscious to be criminal.'"  Id., quoting

21     Elonis v. United States, 575 U.S. 723, 734 (2015).  Indeed, the Supreme Court has expounded

22     that "consciousness of wrongdoing is a principle 'as universal and persistent in mature systems

23     of [criminal] law as belief in freedom of the human will and a consequent ability and duty of the

24     normal individual to choose between good and evil."  Id. (alteration in original), quoting Elonis,

25     575 U.S. at 250.  Therefore, "[t]he existence of a _mens rea_ is the rule of, rather than the

26     ─────────────────

[5] Defendant's additional argument at trial that he did not receive actual notice is without merit.  (ECF No. 32, p.

27     97:2-10.)  As stated above, the Court finds Defendant's testimony that he called Coarsegold Fire Station 8 to be not
credible.  Moreover, even assuming that the Government must present evidence that an order was "posted" within

28     the meaning of 36 C.F.R. § 261.51, neither Section 261.51 nor Section 261.52(a) require that a defendant have
actual notice in order to violate the regulation.

1   exception to, the principles of Anglo-American criminal jurisprudence." <u>Staples v. United</u>
2   <u>States</u>, 511 U.S. 600, 605(1994), quoting <u>United States v. United States Gypsum Co.</u>, 438 U.S.
3   422, 436 (1978).

4        Accordingly, when interpreting criminal statutes, federal courts normally "start from a
5   longstanding presumption, traceable to the common law, that Congress intends to require a
6   defendant to possess a culpable mental state." <u>Rehaif v. United States</u>, 588 U. S. 225, 228-29
7   (2019). This culpable mental state has been described as "'scienter,' which means the degree of
8   knowledge necessary to make a person criminally responsible for his or her acts." <u>Ruan</u>, 597
9   U.S. at 458, citing <u>Rehaif</u>, 588 U.S. at 228-29; Black's Law Dictionary 1613 (11th ed. 2019).
10  For example, the Supreme Court has "read into criminal statutes that are '*silent* on the required
11  mental state'—meaning statutes that contain no *mens rea* provision whatsoever—'that *mens rea*
12  which is necessary to separate wrongful conduct from otherwise innocent conduct.'" <u>Id.</u>
13  (cleaned up and emphasis in original), quoting <u>Elonis</u>, 575 U.S. at 736. "Unsurprisingly, given
14  the meaning of scienter, the *mens rea* [the Supreme Court has] read into such statutes is often
15  that of knowledge or intent." <u>Id.</u>, citing <u>Staples</u>, 511 U.S. at 619; <u>Gypsum Co.</u>, 438 U.S. at 444-
16  46. This is logically sound because "[t]he presumption in favor of scienter requires a court to
17  read into a statute only that *mens rea* which is necessary to separate wrongful conduct from
18  'otherwise innocent conduct.'" <u>Carter v. United States</u>, 530 U.S. 255, 268 (2000), quoting
19  <u>United States v. X-Citement Video, Inc.</u>, 513 U.S. 64, 72 (1994).

20       One caveat, "'knowingly' does not necessarily have any reference to a culpable state of
21  mind or to knowledge of the law." <u>Bryan v. United States</u>, 524 U.S. 184, 192 (1998). In other
22  words, "the knowledge requisite to knowing violation of a statute is factual knowledge as
23  distinguished from knowledge of the law." <u>Id.</u> at 193, quoting <u>Boyce Motor Lines v. United</u>
24  <u>States</u>, 342 U.S. 337, 345 (1952) (J., Jackson, dissenting). "Thus, unless the text of the statute
25  dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts
26  that constitute the offense." <u>Id.</u>

27       In support of his argument for a *mens rea* of reckless or negligent, Defendant relies
28  primarily on precedent, which the Court addresses. In <u>Liparota</u>, the Supreme Court was

1    confronted with how to interpret the *mens rea* for Title 7 U.S.C. § 2024(b)(1), which reads:

2    "'whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization

3    cards in any manner not authorized by [the statute] or the regulations' is subject to a fine and

4    imprisonment." <u>Liparota v. United States</u>, 471 U.S. 419, 420 (1985), quoting 7 U.S.C. §

5    2024(b)(1).   Though the statute contained a "knowingly" element, "[t]he question presented

6    [was] whether in a prosecution under this provision the Government must prove that the

7    defendant knew that he was acting in a manner not authorized by statute or regulations." <u>Id.</u> at

8    420-21.   Regarding this, the Government argued that the statute imposed no *mens rea*, while the

9    petitioner argued that it required a *mens rea* of knowingly. <u>Id.</u> at 423.   In addition to discussing

10   the principles outlined above, the Supreme Court observed the use of the word 'knowingly' in

11   the statute and that Section 2024(b)(1) would be particularly broad in criminalizing behavior

12   without at least a *mens rea* of knowingly as to whether the defendant knew his conduct was

13   authorized. <u>Id.</u> at 432; <u>see also</u> <u>X-Citement Video, Inc.</u>, 513 U.S. at 68, 78 (holding that the use

14   of the *mens rea* 'knowingly' in the statute applied to all elements of the statute).   Thus, the Court

15   held that the Government must "prove that petitioner knew that his acquisition or possession of

16   food stamps was unauthorized." <u>Id.</u> at 434.   Though this case supports Defendant's argument

17   that a *mens rea* element in general applies to Section 261.52(a), it is an example of the Supreme

18   Court determining that knowingly was the most appropriate *mens rea* as to the relevant conduct.

19       Defendant also cites to <u>Staples</u>, a case where the Supreme Court was confronted with

20   whether the National Firearms Act, 26 U.S.C. § 5861(d), required a *mens rea* element. <u>Staples v.</u>

21   <u>United States</u>, 511 U.S. 600 (1994).   Section 5861(d) makes it a crime, punishable by up to 10

22   years in prison, "for any person to posses a firearm that is not properly registered." <u>Id.</u> at 603.

23   The Court observed that the statute provided "little explicit guidance," but the Court was guided

24   by its precedent, as well as the harsh punishment of 10 years, in inferring a *mens rea* of

25   'knowingly' to the statue. <u>Id.</u> at 605-16, 619.   Again, the Court finds Defendant's precedent to

26   be an example of reading in a knowing *mens rea* element, as opposed to negligent or reckless.

27       Defendant's final precedent comes from the Ninth Circuit.   In <u>Velte</u>, the defendant was

28   charged with willfully setting fire to federal land without authority, in violation of 18 U.S.C. §

1855. <u>United States v. Velte</u>, 331 F.3d 673, 675-76 (9th Cir. 2003). In particular, the defendant

had been in the Cleveland National Forest when a fire was set that consumed a large tract of

land. <u>Id.</u> at 675. An officer approached the flames and saw the defendant sitting behind the

wheel of a vehicle. <u>Id.</u> The defendant stated he did not think he had started the fire, but he

admitted to the officer that he had been smoking a cigarette "during his foray into the forest." <u>Id.</u>

at 676. The defendant "further claimed that he did not purposefully start the fire, and that if his

cigarette was indeed the cause of the fire, it was unintentional." <u>Id.</u> An investigation was

conducted, and it was determined that "burn indicators" led to "a small piece of white paper with

burnt edges within the area that he ascertained was the point of origin." <u>Id.</u> Based on

circumstantial and testimonial evidence, a jury convicted the defendant of willfully setting fire to

federal land without authority. <u>Id.</u> However, the district court entered an order granting the

defendant's motion for judgment of acquittal. <u>Id.</u> The district court determined that no

reasonable trier of fact could find beyond a reasonable doubt that the defendant acted "without

authority" in setting the fire in the forest." <u>Id.</u>

The Ninth Circuit affirmed in part, reversed in part, and remanded. As relevant here, the

primary dispute regarding the interpretation of 18 U.S.C. § 1855 was the meaning of "without

authority." <u>See id.</u> at 677. The defendant argued that the Government was required to present

evidence of a specific prohibition against the setting of intentional fires because "unless

otherwise prohibited by Forest Service regulations, individuals have an affirmative right to set

fire to federal lands." <u>Id.</u> The Court rejected that baseline proposition but determined that

Section 1855, based on statutory interpretation, "prohibits the setting of fires to federal lands that

are done willfully and without either the express or implied authorization of the government."

<u>Id.</u> at 678.

As an aside to this determination, the Ninth Circuit further addressed in a footnote the

defendant's contention that unless otherwise prohibited by Forest Service regulations,

individuals have an affirmative right to set fire to federal lands. <u>Id.</u> at 677 n.1. The Court noted

that the defendant had also argued that Section 1855 "cannot encompass the setting of fire to

national forests because other federal regulations govern this same activity." <u>Id.</u> In the

1  defendant's view, "unless prohibited by an order in accordance with 36 C.F.R. §§ 261.50,

2  261.51, and 261.52, the defendant asserted there was an unfettered right to start a fire in the

3  national forests." Id.  The Court rejected this position, observing that a "more sensible

4  interpretation, that comports with the statutory scheme, [was] that these regulations enable the

5  Forest Service to prohibit fire not covered by 18 U.S.C. § 1855." Id.  The Court continued,

6  "[f]or example, these regulations authorize the Forest Service to prohibit the negligent and

7  reckless setting of fires as opposed to 18 U.S.C. § 1855 which only proscribes willy set fires."

8  Id.

9         That previous sentence is what Defendant has identified from Velte as supporting that

10  Section 261.52(a) should include a *mens rea* of reckless or negligent.  Defendant goes so far as

11  to assert that this footnote is not dicta but a holding, and even if it were dicta, Defendant

12  contends it is well-reasoned and thus the law of the Circuit.  (ECF No. 26, p. 3.)  The Court

13  disagrees.  The footnote was not necessary to the Ninth Circuit's statutory analysis of Section

14  1855; rather, it appears the Ninth Circuit wished to address the defendant's ancillary argument in

15  a footnote.  Furthermore, the Velte Court's footnote does not qualify as "well-reasoned dicta"

16  within the meaning of the law of the Ninth Circuit.  In Johnson, the Ninth Circuit held that

17  "where a panel confronts an issue germane to the eventual resolution of the case, and resolves it

18  after reasoned consideration in a published opinion, that ruling becomes the law of the circuit,

19  regardless of whether doing so is necessary in some strict logical sense." United States v.

20  Johnson, 256 F.3d 895, 914 (9th Cir. 2001).  The term "well-reasoned dicta" has subsequently

21  become a term of art for the principle outlined in Johnson.  See United States v. McAdory, 935

22  F.3d 838, 843 (9th Cir. 2019).  Applied here, the Velte Court confronted in the footnote only the

23  defendant's contention that Section 1855 could never encompass setting a fire in the national

24  forests.  In describing its reasoning, the Court gave an example that Section 261.52 could cover

25  the negligent and reckless setting of fires, while Section 1855 covered willfully set fires.  The

26  Court did not confront the issue of whether Section 261.52(a) necessarily implicated a *mens rea*

27  element.  Therefore, the Court's characterization of Section 261.52 as covering negligent or

28  reckless fires is not the law of the Circuit insofar as negligent or reckless being the appropriate

1  *mens rea*.   Rather, on its own terms, the <u>Velte</u> Court was apparently delineating, for the

2  defendant's benefit, that the C.F.R. and Section 1855 work in harmony, with the C.F.R. covering

3  certain types of fires and Section 1855 covering other types of fires.   No more, no less.

4  Therefore, the Court does not find <u>Velte</u> persuasive insofar as requiring a *mens rea* of reckless or

5  negligent in Section 261.52(a).

6         In contrast, the Government has provided a case where the Ninth Circuit determined a

7  violation of a regulation required no mental state.   In <u>Kent</u>, the Ninth Circuit reached the issue of

8  whether 36 C.F.R. § 261.10(b) included a *mens rea* element.   <u>United States v. Kent</u>, 945 F.2d

9  1441, 1445 (9th Cir. 1991).   The regulation at issue prohibited:   "Taking possession of,

10 occupying, or otherwise using National Forest System lands for residential purposes without a

11 special-use authorization, or as otherwise authorized by Federal law or regulation."   <u>Id.</u>, quoting

12 36 C.F.R. § 261.10(b).   The Court began that its prior decision in <u>United States v. Wilson</u>, 438

13 F.2d 525 (9th Cir. 1971), compelled the holding that Section 261.10(b) did not contain a *mens*

14 *rea* element.   <u>Id.</u>  In <u>Wilson</u>, the regulation at issue prohibited: "Cutting or otherwise damaging

15 any timber, tree, or other forest product, except as authorized by a special-use authorization,

16 timber sale contract, or Federal law or regulation."   <u>See id.</u>, citing 36 C.F.R. § 261.6(a).   The

17 <u>Wilson</u> Court determined that the omission of a *mens rea* element made sense regarding Section

18 261.6(a) because "[t]he necessity of proving in each instance that the trespasser knew that he had

19 crossed the often poorly marked boundaries of a national forest might make the regulatory

20 scheme excessively difficult to enforce."   <u>Id.</u>, quoting <u>Wilson</u> 438 F.2d at 525.   The <u>Kent</u> Court

21 observed that Section 261.10(b) was virtually indistinguishable regarding this issue.   <u>Id.</u>

22 Furthermore, the Court observed that interpreting the regulation to contain a *mens rea* would

23 "make the regulatory scheme excessively difficult to enforce."   <u>Id.</u>, quoting <u>Wilson</u>, 438 F.2d at

24 525.   To be sure, the <u>Kent</u> Court observed that "[s]trict criminal liability is strong medicine, and,

25 accordingly, [the Court has] read criminal intent requirements into some Forest Service

26 regulations, where their language remotely suggested it."   <u>Id.</u>  In light of the foregoing, and

27 because the statute in question did not contain language implying a requisite state of mind, the

28 Court concluded that Section 261.10(b) did not require a *mens rea* element.

1    Tough the Court acknowledges the holding in <u>Kent</u>, it is distinguishable from the present
2    case.  While Section 261.52(a) does not include language that necessarily suggests a requisite
3    state of mind, the Court begins, as it must, with the premise that "[t]he existence of a *mens rea* is
4    the rule of, rather than the exception to, the principles of Anglo-American criminal
5    jurisprudence."  <u>Staples</u>, 511 U.S. at 605, quoting <u>Gypsum Co.</u>, 438 U.S. at 436.  Furthermore,
6    the Court observes that a violation of Section 261.52(a) is punishable by not more than six (6)
7    months incarceration and/or a $5,000 fine.  Regarding the Government's position, the Court
8    notes that the Government has not provided an argument as to that if there were a *mens rea* the
9    regulatory scheme at issue here would be excessively difficult to enforce, which appears to be
10   the animating force behind the Ninth Circuit's holding of strict liability in <u>Kent</u> and <u>Wilson</u>.
11   Regarding Defendant's position that the *mens rea* should be reckless or negligent, Defendant
12   likewise has not provided an argument (beyond citing to <u>Velte</u>) to support his position.  Thus, the
13   Court is left to make its determination guided only by Supreme Court precedent.

14   Given that the existence of a *mens rea* is the rule under the principles of Anglo-American
15   criminal jurisprudence, coupled with the presumption that Congress intends to require a
16   defendant to possess a culpable mental state, the Court finds that Section 261.52(a) contains a
17   *mens rea* element.  The Court finds a *mens rea* element is necessary here to separate wrongful
18   conduct from otherwise innocent conduct.  Having considered Defendant's argument and
19   consulting Supreme Court precedent, the Court finds that a *mens rea* of "knowingly" is
20   appropriate.  The Court comes to this decision guided by the Supreme Court acknowledging that
21   often the *mens rea* read into statutes is knowingly, <u>Ruan</u>, 597 U.S. at 458, along with
22   requirement that the Court "read into a statute only that *mens rea* which is necessary to separate
23   wrongful conduct from 'otherwise innocent conduct.'"  <u>Carter</u>, 530 U.S. at 268, quoting <u>X-</u>
24   <u>Citement Video, Inc.</u>, 513 U.S. at 72.  Finally, the Court observes that the *mens rea* of knowingly
25   in Section 261.52(a) applies only to "proof of knowledge of the *facts* that constitute the offense."
26   Bryan, 524 U.S. at 192 (emphasis added).  In other words, the knowingly *mens rea* applies only
27   to whether a defendant knowingly built, maintained, attended, or used a fire, campfire, or stove
28   fire.

In sum, the Court concludes that Section 261.52(a) requires a "knowingly" *mens rea* element as to whether a defendant knowingly built, maintained, attended, or used a fire, campfire, or stove fire.

### D.    Findings of Fact

First, the Court finds that the Government has proven beyond a reasonable doubt that on September 7, 2024, Defendant knowingly built, maintained, attended, or used a fire, campfire, or stove fire.  Specifically, the Court finds that on September 7, 2024, at around 10:00 a.m., Officer Sharpe testified that he arrived at the campsite in question and witnessed a campfire.  (ECF No. 32, p. 28:9-14; p. 50:19-22.)  Following a conversation between Officer Sharpe and Defendant, Officer Sharpe testified that Defendant admitted to adding wood to a fire.  (Id. at p. 31:8-11.)  Furthermore, Defendant testified that on September 7, 2024, he started a small fire.  (Id. at p. 79:11-16; 84:21-23.)  The Court finds the testimony of Officer Sharpe and Defendant to be credible on this issue.

Second, the Court finds the Government has proven beyond a reasonable doubt that there was an order that prohibited fires, campfires, and stove fires in place on that date.  Captain Villanueva testified that in September 2024, there was a superseding fire order in effect, which was effective from August 30, 2024, through November 15, 2024.  (Id. at 7:22-24; pp. 9:2-10:1.)  Captain Villanueva thus testified that on September 7, 2024, the superseding fire order was in effect.  (Id. at 10:15-19.)  The superseding fire order was entered into evidence with no objections as Exhibit 2.  (Id. p. 8:22-24; p. 9:23-10:1.)  Captain Villanueva testified that the superseding fire order restricted fires, including campfires, in the Sierra National Forest in disperse camping areas.  (Id. at pp. 9:6-10-14.)  Captain Villanueva testified given his training and experience, the superseding order was posted in accordance with the usual procedures of the district offices.  (Id. at pp. 11:15-13:15.)  Captain Villanueva testified that this included front desk personnel posting the superseding fire order in the district offices, as well as district office personnel posting signs along the relevant corridors.  (Id. at pp. 12:19-13:2.)  Officer Sharpe testified that on September 7, 2024, he was aware that there was a fire restriction in effect.  (Id. at p. 26:11-13.)  The Court finds the testimony of Captain Villanueva and Officer Sharpe to be

credible on the issue of whether a fire restriction order was in effect.

Third, the Court finds the Government has proven beyond a reasonable doubt that Defendant's act occurred within the Sierra National Forest, within the boundaries of federal owned lands and waters administered by the National Forest System.  Officer Sharpe testified that on September 7, 2024, he received information that there was a campfire off Sky Ranch Road, an area that hosts campsites within the Sierra National Forest.  (Id. at p. 27:1-28:4.) Officer Sharpe testified that this was a campsite off Sky Ranch Road is where he encountered Defendant and the campfire.  (Id. at p. 28:8-31:11.)  The Court finds Officer Sharpe's testimony to be credible as to the issue of whether Defendant's act occurred in the Sierra National Forest, within the boundaries of federal owned lands and waters administered by the National Forest System.

## IV.

## CONCLUSION AND VERDICT

Accordingly, the Court finds Defendant to be guilty of violating 36 C.F.R. § 261.52(a).

IT IS SO ORDERED.

Dated:   **November 20, 2025**

STANLEY A. BOONE
United States Magistrate Judge